IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| METRO COMMERCIAL REAL ESTATE, INC. | : | CIVIL ACTION |
| | : | |
| v. | : | |
| | : | |
| CIBC INC. | : | NO. 11-7480 |

<u>MEMORANDUM</u>

**Padova, J.**                                                                                     **October 25, 2012**

Plaintiff Metro Commercial Real Estate, Inc. ("Metro") commenced this action seeking to recover commissions that it is allegedly owed for procuring tenants for a commercial property.  The property owner, WSC Warminster Plaza Associates ("WSC"), defaulted on a mortgage it obtained on the property from Defendant CIBC, Inc. ("CIBC").  Plaintiff now seeks to obtain its commissions from CIBC.  CIBC has filed a Motion to Dismiss Metro's Amended Complaint pursuant to Federal Rule Civil Procedure 12(b)(6).   For the following reasons, we grant the Motion.

**I.      BACKGROUND**

The Amended Complaint (the "Complaint") alleges that, in October 2007, WSC, the owner of property at 600 York Road in Warminster, Pennsylvania (the "Property"), entered into a construction loan agreement with Defendant CIBC.  (Compl. ¶¶ 6-7.)  The purpose of the loan was to fund the construction of a shopping center on the Property, to be known as Warminster Plaza, and to that end, CIBC agreed to loan WSC up to $16 million.  (<u>Id.</u>; <u>see</u> Ex. B. to Compl., at 1)  In connection with the loan agreement, WSC and CIBC executed (1) a Cash Management Agreement, (2) an Assignment of Leases and Rents, and (3) a Deposit Account Control Agreement.  (Compl. ¶ 7; Exs. A-C to Compl.)  The Assignment of Leases and Rents provides that "[a]ll Rents and Profits . . . generated by or derived from the Property shall first be utilized solely for current expenses

directly attributable to the ownership and operation of the Property." (Compl. ¶ 8; Ex. B to Compl., at 4 ¶ 6.)

On August 11, 2008, WSC retained Plaintiff Metro, a licensed real estate broker, to secure tenants for the Property. (Compl. ¶ 10.) The two parties entered into an Exclusive Leasing Listing Agreement (the "Listing Agreement") and Schedule of Sale and Leasing Commissions. (Id.; Ex. D to Compl.) In those documents, WSC agreed to pay Metro a leasing commission of 5% of the minimum base rent for the initial term of any lease entered into pursuant to the terms of the Listing Agreement, with 50% of the commission to be paid upon execution of the lease, and 50% to be paid when the tenant begins paying rent or when the tenant opens for business, whichever is earlier. (Compl. ¶ 11; Ex. D. to Compl.) CIBC was aware that the success of WSC's project and repayment of CIBC's loan was dependent upon CIBC obtaining tenants for the Property. (Id. ¶ 13.) CIBC also "knew of and accepted the terms of the [L]isting [A]greement." (Id. ¶ 14.)

Between June of 2009 and January of 2010, with Metro's assistance, WSC executed leases with five tenants for whom leasing commissions were then due to Metro pursuant to the Listing Agreement. (Id. ¶¶ 15-20.) WSC, however, did not pay Metro the commissions that were owed. (Id. ¶ 22.) As a result, on November 9, 2009, Metro filed suit against WSC in the Bucks County Court of Common Pleas. (Id. ¶ 23.) That same month, WSC defaulted on its mortgage with CIBC by failing to pay its loan at maturity. (Id. ¶ 24.)

On December 24, 2009, WSC and CIBC entered into a Forbearance Agreement. (Id. ¶ 25.) Ten months later, in October 2010, WSC and Metro entered into a settlement agreement to resolve Metro's claims for commissions, but WSC failed to make payments under the agreement. (Id. ¶ 26.)

In November 2010, CIBC took control of WSC's deposit account and sent a letter of exclusive control to the depository bank.  (Id. ¶ 27.)  CIBC also sent demand letters to tenants at the Property, directing them to pay rents into the deposit account, over which CIBC had exclusive control, thereby eliminating WSC's source of revenue and ability to pay commissions due under the Listing Agreement.  (Id.)

In December 2010, CIBC and WSC entered into a Second Forbearance Agreement, which confirmed the actions that CIBC had taken the prior month, and WSC agreed to direct its tenants at the Property to deposit all lease payments into a bank account under CIBC's control.  (Id. ¶ 28.) Pursuant to that Agreement, CIBC has taken control of the financial management and operations of the Property.  (Id. ¶ 29.)  CIBC has the right to approve or reject leases for space at the Property, has the right to approve or reject both routine and non-routine expenses at the Property, and has the right to terminate and replace the management company that manages the Property.  (Id. ¶¶ 30-33.)  At the same time, CIBC receives the benefit of the leases subject to the Listing Agreement, which amounts to more than $60,000 per month.  (Id. ¶¶ 34-35.)

On October 15, 2010, Metro filed a petition to enforce its settlement agreement with WSC, and it received a judgment against WSC in the amount of $633,461.00 in June of 2011.  (Id. ¶ 38.) On November 4, 2011, Metro served a demand for payment upon CIBC, requesting payments of the past due and owing lease commissions, plus interest and attorney's fees.  (Id. ¶ 39.)  CIBC has, however, failed and refused to pay the leasing commissions due and owing to Metro in the amount of $633,461.  (Id. ¶ 40.)  Metro therefore instituted this action, seeking to obtain a judgment against CIBC for the unpaid commissions.

## II.   LEGAL STANDARD

When considering a motion to dismiss pursuant to Rule 12(b)(6), we consider both the complaint and the exhibits attached to the complaint.  Mayer v. Belichick, 605 F.3d 223, 230 (3d Cir. 2010) (citing Pension Benefit Guar. Corp. v. White Consol. Indus., Inc., 998 F.2d 1192, 1196 (3d Cir.1993)).   We take the factual allegations of the complaint as true and draw all reasonable inferences in favor of the plaintiff.  Phillips v. Cnty. of Allegheny, 515 F.3d 224, 233 (3d Cir. 2008) (citing Pinker v. Roche Holdings Ltd., 292 F.3d 361, 374 n.7 (3d Cir. 2002)).   Legal conclusions, however, receive no deference, and the court is "not bound to accept as true a legal conclusion couched as a factual allegation."  Papasan v. Allain, 478 U.S. 265, 286 (1986) (cited with approval in Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007)).

A plaintiff's pleading obligation is to set forth "a short and plain statement of the claim," Fed. R. Civ. P. 8(a)(2), which gives the defendant "fair notice of what the . . . claim is and the grounds upon which it rests."  Twombly, 550 U.S. at 555 (alteration in original) (quotation omitted).  The "complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Twombly, 550 U.S. at 570).  "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully."  Id. (quoting Twombly, 550 U.S. at 556).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  Id. (citation omitted).  In the end, we will dismiss a complaint if the factual allegations in the complaint are not sufficient "to raise a right to relief above the speculative level."  Twombly, 550 U.S. at 555 (citing

5 Charles Allen Wright & Arthur R. Miller, <u>Federal Practice and Procedure</u> § 1216, at 1235-36 (3d ed. 2004)).

## III.    DISCUSSION

CIBC seeks dismissal of Metro's Complaint in its entirety, asserting that Metro has failed to state any claim upon which relief may be granted.  Metro opposes CIBC's Motion, maintaining that it has stated three cognizable claims against CIBC.  First, it asserts that it has stated a claim against CIBC pursuant to Pennsylvania law as set forth in <u>Grosser v. Rosen</u>, 259 A.2d 679 (1969), which it characterizes as holding that " a mortgagee who takes the benefit of the mortgagor's leases by collecting rent must also accept the burdens of the lease, including the payment of broker's commissions."  (Compl. ¶ 36.)  Second, it asserts that it has stated a claim against CIBC as an "undisclosed principal" to the Listing Agreement and, therefore, a party to that Agreement.  Third, it asserts that it has stated a claim for unjust enrichment.  We conclude, however, that none of these claims are cognizable under prevailing law.  We therefore grant CIBC's Motion and dismiss Metro's Complaint in its entirety.

### A.    Liability under <u>Grosser v. Rosen</u>

Metro first asserts that CIBC is liable for its commissions based on the law set forth in <u>Albert J. Grosser Co. v. Rosen</u>, 259 A.2d 679 (Pa. 1969), a case in which a mortgagee in possession was held liable for the payment of a real estate broker's commissions.  CIBC argues in its Motion to Dismiss that the facts in <u>Grosser</u> are distinguishable from the facts in the instant case and that

Grosser is therefore inapplicable here.[1]  We agree.

In Grosser, a company called Bargain City retained plaintiff Albert J. Grosser, a real estate broker, to secure a tenant for premises it owned.  Id. at 679-80.  Grosser secured Linville Corporation ("Linville") as a tenant and negotiated a ten-year lease on Bargain City's behalf.  Id. at 680.  A few years later, Bargain City obtained a mortgage on its property from a bank, which thereafter assigned the mortgage to Defendant A.A. Rosen ("Rosen").  Id.  When Bargain City defaulted on the mortgage, Rosen stepped in as mortgagee in possession and began collecting Linville's rent.  Id.  Thereafter, Grosser brought a civil action against Rosen for payment of its commissions.

The lease between Grosser and Linville provided that Grosser could "permit payment of the leasing brokerage due to be spread over the period of the lease, . . . by collecting the rent due . . . and retaining 5% [t]o cover both leasing brokerage and management commission."  Id. at 680.  The lease further provided that, if Grosser's agency were ever terminated, Grosser would receive a lump sum payout calculated based on rents due for the balance of the lease term.  Id.  Such payment obligations bound not only the parties to the lease but also "assigns, heirs, executors, administrators and successors of [Bargain City]."  Id. at 681.  The lease also specifically provided that Grosser would retain the lease "in its possession under lien for its services," and that "'[n]o grantee, assignee, receiver, trustee, encumbrancer, or other person or officer shall adopt or receive the benefits of this

---

[1]The parties vigorously dispute whether Metro has adequately alleged that CIBC is a mortgagee in possession.  We agree with Plaintiff, however, that Grosser's holding was not dependent on the defendant creditor's status as a mortgagee in possession.  See Metro Br. at 7 ("[T]he lender in Grosser was described as a mortgagee in possession, but the court did not rely on that fact for its holding.")  Accordingly, we need not determine whether the Complaint has adequately alleged that CIBC is a mortgagee in possession in order to resolve the question of whether it states a claim upon which relief may be granted based on the law set forth in Grosser.

lease without paying said brokerage.'"  Id.  at 680 (quoting lease).

In analyzing whether Rosen was liable to Grosser for the commissions, the Pennsylvania Supreme Court observed that, "in the abstract," the two provisions regarding the obligations of assignees of the lease were "irrelevant," reasoning  that "[b]efore Rosen can be found liable for the[] [commission] payments, he must have done something to show an assent . . . ." Id. at 681.  The Court then concluded that, under the circumstances presented, Rosen was liable for the commissions, because "[b]y taking the benefits of the lease and collecting the rents, Rosen has adopted the lease and must likewise take the burden."  Id.

Metro argues that its situation is comparable to that of Grosser and, thus, just as Rosen was liable for Grosser's commissions, CIBC is liable for Metro's commissions.   However, Metro discounts crucial distinctions between its situation and Grosser's, such as the provisions in Linville's lease that provided that: (1) a portion of the lease payments each month would be used to pay Grosser's commissions, and (2) no one could receive the benefits of the lease without paying the brokerage.  Id. at 680.  Metro concedes that the Grosser lease "contained several provisions that favored the broker's claim for payment of commissions by the lender," but maintains that "the Grosser court did not rely on those provisions for its decision."  (Metro Br. at 7.)

In particular, Metro relies on the following portion of Grosser:

> In the abstract it is irrelevant that Section 37 [of the lease] says 'All the provisions of this clause shall bind assigns, heirs, executors, administrators and successors of Principal' and that Section 39 [of the lease] says 'No grantee, assignee, receiver, trustee, encumbrancer or other person or officer shall adopt or receive the benefits of this lease without paying said brokerage.'

259 A.2d at 316-17.  Metro contends that the court thus deemed these two provisions "irrelevant"

and not pertinent to its holding.  However, Metro is wrong.  It is clear that the Court's comment that

the provisions were irrelevant "[i]n the abstract" meant that the provisions were only meaningful

when examined in their factual context.  The Court concluded that Rosen was obligated to assume

the burdens of the lease, including the explicit lease obligation to make monthly brokerage

commission payments, after examining the provisions in their factual context, i.e., taking into

account that Rosen had shown assent to the lease by collecting rents under it.[2]  We therefore reject

Metro's suggestion that the Court's holding was unconnected to the specific lease provisions in that

case, as the Court's conclusion that Rosen was liable for Grosser's commissions was dependent upon

the specific terms of Linville's lease, which both provided for the payment of the commission out

of rental payments and bound anyone collecting rents under the leases to pay Grosser's brokerage.

The instant case, in contrast, presents a very different scenario and rests on critically different

lease provisions.  Unlike the lease in Grosser, WSC's leases with tenants do not contemplate the

payment of Metro's commission from the tenants' lease payments.  Rather, each lease makes clear

that WSC is solely responsible for any broker commission, pursuant to a separate agreement with

the real estate broker.  (See, e.g., Appliance Solutions Lease, ¶ 51 ( "[WSC] shall be responsible for

any brokerage commission due or owing as a result of this transaction, pursuant to a separate

agreement with its Broker."), attached as Ex. E to Compl.; Scary Putts, Inc. Lease ¶ 52 ("[T]he

---

[2]We find additional support for our conclusion that the provisions at issue were not ultimately irrelevant to the Supreme Court's holding in the Court's phrasing of its  conclusion, which was that Rosen was liable for the brokerage burdens because he "adopted the lease" by "taking the benefits of the lease and collecting the rents," and which tracks the language used in Section 39 of the lease. Id. at 316-17 (quoting lease as stating "No . . . person or officer shall adopt or receive the benefits of this lease without paying said brokerage.")

broker-agent fee shall be paid by [WSC] pursuant to a separate agreement."), attached as Ex. H to Compl.)  Moreover, the Listing Agreement provides that WSC will pay the commissions up front, not in installments from the monthly rents, making the final commission payment either when the tenant first begins paying rent or when the tenant opens for business on the leased premises**.** (Compl. ¶ 11.) The leases also contain no provision like that in <u>Grosser</u> that requires  any person who adopts or receives the benefits of the lease to pay any outstanding brokerage commissions.   As a result, even if the CIBC's collection of rents under the leases subjected it to any burdens that the leases imposed, as <u>Grosser</u> arguably suggests, the leases do not impose any obligation to pay brokerage commissions; rather, any such obligations are covered by a separate agreement between WSC and Metro, which required that Metro's commissions be paid in full <u>before</u> monthly rental payments began.   Thus, in this case, CIBC's assumption of both the benefits and the burdens of the leases at issue simply does not include the burden of paying commissions, much less the burden of paying commissions from the monthly rents collected.

In sum, while Rosen's "adoption" of the lease in Grosser subjected Rosen to the obligation in the lease to make monthly commission payments, CIBC's collection of lease payments in the instant case in no way subjected it to any comparable obligation. We find no support in <u>Grosser</u> for the proposition that CIBC's collection of rents somehow subjected it to WSC's legal obligations set forth in the Listing Agreement, a wholly separate legal document.  Under all of these circumstances, we find Metro's reliance on <u>Grosser</u> to establish CIBC's liability for WSC's prior brokerage debt to be misguided.   We therefore grant WSC's Motion to Dismiss insofar as it seek dismissal of Metro's claim against WSC based on the law set forth in <u>Grosser</u>.

### B.     Liability as an Undisclosed Principal to the Listing Agreement

Metro also asserts that CIBC is liable for its commissions as an "undisclosed principal" to the Listing Agreement.  Metro reasons that, given the previously-executed Assignment of Leases and Rents, "any lease obtained during Metro's exclusive listing period was obtained for the benefit of CIBC, the assignee of existing and future leases," making CIBC WSC's principal with respect to the Listing Agreement.  (Metro Br. at 17.)

We first note that, in spite of Metro's inclusion of this argument in its brief in opposition to the Motion to Dismiss, we can discern no claim against CIBC as an undisclosed principal in the Complaint.  Count I of the Complaint is Metro's claim under Grosser, Count III is the unjust enrichment claim, and Count II appears to assert a claim to funds in a reserve account, which Metro has apparently abandoned.   The Complaint never uses the word "principal" or "agent," much less the precise two-word phrase "undisclosed principal."  We therefore conclude that the Complaint contains no claim against CIBC as an undisclosed principal.  Nevertheless, given Metro's attempt to articulate such a claim in its brief, we will address the claim to establish its futility.

In advancing the undisclosed principal claim, Metro relies on basic principles of actual agency, which state that an agency relationship exists when there is "(1) manifestation by the principal that the agent shall act for him; (2) the acceptance of the undertaking by the agent; and (3) the control of the endeavor in the hands of the principal."   Tribune-Review Publ'g Co. v. Westmoreland Cnty Hous. Auth., 833 A.2d 112, 119-120 (Pa. 2003) (citing Basile v. H & R Block, Inc., 761 A.2d 1115 (Pa. 2000)).  "The burden of establishing agency rests upon the party asserting it."  Scott v. Purcell,  415 A.2d 56, 61 n.8 (Pa. 1980) (citation omitted).  However, "[i]t is not

necessary [for the party] to furnish direct evidence of the specific authority if [the authority] can be reasonably inferred from the circumstances of the case."  Id. (citation omitted).  Where an actual agency relationship exists, the principal is bound to the contracts made by the designated agent, whether or not the party contracting with the agent knows of the existence of the principal.  Brown v. German-American Title & Trust Co., 34 A. 335, 1896 Pa. LEXIS 906, *10 (Pa. 1896) (citation omitted).

Without citing any relevant authority, Metro argues that the factual allegations of the Complaint permit an inference that CIBC was Metro's principal because it plausibly alleges that Metro entered into the Listing Agreement for the benefit of CIBC.  It argues that we can infer the existence of an agency relationship from the Complaint's allegations that: (1) WSC had assigned its future leases and rents to CIBC before entering into the Listing Agreement with Metro (Compl. ¶ 7); (2) CIBC knew that the success of the project and repayment of the loan were dependent upon obtaining tenants for the Property (id. ¶ 13); (3) CIBC was aware of the Listing Agreement and accepted its terms (id. ¶ 14); and (4) Metro had the power to accept or reject the terms of the leases and, in fact, exercised that right (id. ¶ 30).

However, the mere fact "that one person does an act for another" does not give rise to an inference that an agency relationship existed.  B & L Asphalt Indus., Inc. v. Fusco, 753 A.2d 264, 269 (Pa. Super. Ct. 2000) (citing Ferry v. Fisher, 709 A.2d 399, 409 n.5 (Pa. Super. Ct. 1998)).  Rather, "[a]gency results only if there is an agreement for the creation of a fiduciary relationship with control by the beneficiary."  Basile v. H & R Block, 761 A.2d at 1120 (quotation omitted).  As the Pennsylvania Supreme Court has explained:

> The special relationship arising from an agency agreement, with its concomitant heightened duty, cannot arise from any and all actions, no matter how trivial, arguably undertaken on another's behalf. Rather, the action must be a matter of consequence or trust, such as the ability to actually **bind** the principal or alter the principal's legal relations. Indeed, implicit in the long-standing Pennsylvania requirement that the principal manifest an intention that the agent act on the principal's behalf is the notion that the agent has authority to alter the principal's relationships with third parties, such as binding the principal to a contract. Notably, the Restatement, which we have cited with approval in this area in the past, specifically recognizes as much. See Restatement (Second) of Agency § 12 ("An agent or apparent agent holds a power to alter the legal relations between the principal and third persons and between the principal and himself.").

Basile, 761 A.2d at 1121.

Here, Metro does not allege in the Complaint or argue in its brief that CIBC controlled WSC's actions in negotiating and executing the Listing Agreement, or that CIBC gave WSC actual authority to bind it to the terms of that Agreement. It alleges only that CIBC passively "knew of and accepted the terms of" the Listing Agreement, which in no way suggests that CIBC was in control. (Compl. ¶ 14.) To create some inference that CIBC exercised control over WSC in connection with the Listing Agreement, Metro relies only on the allegation that CIBC "has the right to approve or reject leases for space at the property" and has, in fact, exercised that right. (Id. ¶ 30.) However, Metro cites no document that reflects this purported right to approve and reject leases and has identified no specific lease that CIBC actually approved or rejected. This allegation therefore fails to satisfy Twombly's plausibility standard. Moreover, even if it met that standard, the mere fact that CIBC may have approved or rejected certain leases subject to the Listing Agreement simply does not support reasonable inferences that WSC was acting under CIBC's control when it executed the Listing Agreement, or that CIBC and WSC intended WSC to alter CIBC's relationship with Metro

12

by binding CIBC to the terms of the Listing Agreement.  The allegation that CIBC, as WSC's secured creditor, would benefit from WSC securing tenants, because the existence of paying tenants would increase the likelihood that CIBC's loan would be repaid, similarly fails to support a reasonable inference that WSC's execution of the Listing Agreement in connection with property that it owned and was developing, was actually done on CIBC's behalf, with the "authority to alter [CIBC's] relationship[] with [Metro]." Basile, 761 A.2d at 1121.

For the foregoing reasons, we conclude that none of Metro's allegations give rise to a reasonable inference that Metro was acting as CIBC's agent – or was in any way controlled by CIBC – when it executed the Listing Agreement.  We thus reject as unreasonable the proferred inference that CIBC's interest in Metro obtaining successful leases and alleged involvement in the leasing process designed to ensure that Metro's leases were adequate security for CIBC's loan transformed CIBC from a classic secured creditor into WSC's undisclosed principal. Cf Brown, 1896 Pa. LEXIS 906, *11-12 (citing with approval a New York case in which "a creditor who advanced to an insolvent debtor the means of continuing his business, with a view of eventually seeing it put upon a paying basis, or sold to some purchaser, and who was consulted as to some details in the subsequent management of the business, was held not thereby to make himself liable as an undisclosed principal for goods furnished directly to the debtor" (citing Perkins v. Huntington, 19 N.Y.S. 71, 72 (N.Y. App. Div. 1892)).

In sum, Metro did not include a claim against CIBC as an undisclosed principal in the Complaint, but even if it had, that claim would fail because Metro has asserted no facts that support a reasonable inference that WSC and CIBC were in an agency relationship, with CIBC controlling

WSC's actions in executing the Listing Agreement, and with the intent that the Listing Agreement would create a legal relationship between CIBC and Metro.  We therefore reject Metro's assertion that it has stated – or can state –  a claim upon which relief can be granted against CIBC as an undisclosed principal.

### C.   Unjust Enrichment

Finally, Metro asserts that CIBC is liable to it on an unjust enrichment theory.  To state a claim for unjust enrichment, a plaintiff must set forth the following elements: (1) benefits conferred on the defendant by the plaintiff; (2) appreciation of such benefits by the defendant; and (3) acceptance and retention of such benefits under circumstances such that it would be inequitable for the defendant "to retain the benefits without payment of value."  Allegheny Gen. Hosp. v. Philip Morris, Inc., 228 F.3d 429, 447 (3d Cir. 2000) (citation omitted); Ne. Fence & Iron Works, Inc, v. Murphy Quigley Co., 933 A.2d 664, 669 (Pa. Super. Ct. 2007) (citation omitted).   The most significant requirement is that the enrichment of the defendant be unjust.  Ne. Fence & Iron Works, 933 A.2d at 669 (quoting Lackner v. Glosser, 892 A.2d 21, 334 (Pa. Super. Ct. 2001)); see also Myers-Macomber Eng'rs v. M.L.W. Constr. Corp., 414 A.2d 357, 360 (Pa. Super. Ct. 1979).  Here, the Complaint alleges that Metro conferred a benefit on CIBC by procuring tenants for the shopping center, CIBC accepted that benefit by collecting and using rents under the leases, and CIBC has been unjustly enriched by accepting the benefit of the leases without paying Metro's commissions. (Compl. ¶¶ 48-50.)

In Myers-Macomber Engineers v. M.L.W. Construction Corporation, the Pennsylvania Superior Court rejected a claim much like Metro's.  414 A.2d 357.  The plaintiff in Myers-

<u>Macomber</u> performed site preparation work for M.L.W. Construction Corporation ("M.L.W."), the owner and developer of condominiums.  <u>Id</u> at 359.  The plaintiff was not paid for its work and became an unsecured creditor of M.L.W.  Meanwhile, prior to the plaintiff having performed its site preparation work, HNC Mortgage and Realty Investors ("HNC") had lent construction money to M.L.W. and obtained as security a construction mortgage.  <u>Id.</u>  M.L.W. defaulted on the loan, and HNC exercised its right under the mortgage to assume control of the project as mortgagee in possession.  <u>Id.</u>  HNC then foreclosed on the mortgage and purchased M.L.W.'s incomplete condominium development at a sheriff's sale.  <u>Id.</u>  Seeking to recover the money it was owed for the site preparation work, the plaintiff brought a claim against HNC for unjust enrichment.  <u>Id.</u>  Plaintiff prevailed against HNC at trial, but the Pennsylvania Superior Court reversed, concluding that, under the circumstances presented, HNC had not been unjustly enriched.  <u>Id.</u> at 360-61.  As the court explained:

> When appellant took possession of the condominium project it had already advanced to the developer the sum of $2,900,000.00. Included in the money advanced was the entire amount budgeted for site preparation.  Thus, it was not unjust that it received the benefit of such engineering work when it was compelled by the developer's default to take possession of the incomplete building project. Moreover, it does not appear that the mortgagee, after purchasing the real estate at sheriff's sale and employing its own contractor to complete the project, was able to dispose of the completed project at a profit.

<u>Id.</u>  The court further observed that "if a contractor chooses to rely upon the personal credit of the party with whom he contracts, a court should not rewrite the contract of the parties . . . to receive payment from a mortgagee who has been compelled to go into possession to preserve its security." <u>Id.</u> at 361.

15

In this case, Metro, like the plaintiff in Myers-Macomber, is an unsecured creditor of a debtor, who is seeking to collect a debt from a secured creditor of the same debtor on the ground that the secured creditor is unfairly reaping the benefits of the unsecured creditor's work without paying for those benefits.  Furthermore, like the secured creditor in Myers-Macomber, CIBC is merely exercising its contractual right to recoup the money that it loaned to the debtor-developer to cover development expenses, by exercising its rights against its contractual security.  The Complaint does not allege that CIBC is reaping a profit from its actions, i.e., that it is taking more from WSC than it is rightfully owed.[3]  It also does not suggest that CIBC's securitization of its loan to WSC was anything but legitimate.  Rather, Metro appears to contend that WSC's debt to it should have priority over WSC's debt to CIBC, and that CIBC should therefore pay Metro from the rents it collects before it pays itself.  This, however, would defeat the very purpose of CIBC's security and might even violate a fiduciary duty that CIBC owes to WSC.  See Myers-Macomber, 414 A.2d at 489-90 ("[A] mortgagee in possession has a [fiduciary] duty [to the mortgagor] to collect the rents and profits which accrue during his occupancy and apply them to the mortgage debt.")

As a result, we conclude, as did the Myers-Macomber court, that the facts alleged do not support a reasonable conclusion that the application of the rents to the outstanding mortgage debt is in any way unjust.  We simply cannot infer any injustice in CIBC's use of the rents to repay WSC's outstanding mortgage debt, which was secured by an assignment of the leases and rents that predated the Listing Agreement, thereby giving CIBC's claim priority over that of Metro.  Under

---

[3]In fact, the Second Forbearance Agreement attached to the Complaint reflects that, as of the date of that Agreement, WSC still owed CIBC over $11,000,000.  (Ex. K to Compl. at Schedule 1.)

these circumstances, we conclude that Metro has failed to state an unjust enrichment claim upon which relief may be granted, and we consequently grant CIBC's Motion insofar as it seeks dismissal of that claim.

## IV.     CONCLUSION

For the foregoing reasons, we conclude that Plaintiff Metro has failed to state any claim on which relief may be granted.  We therefore grant Defendant CIBC's Motion to Dismiss and dismiss the Amended Complaint in its entirety.  An appropriate Order follows.

BY THE COURT:

/s/ John R. Padova, J.
_____
John R. Padova, J.

17